# <u>EXHIBIT A</u>

**RETAIL SALES AND SERVICE AGREEMENT**
**(Lena, Illinois)**

THIS AGREEMENT ("Agreement") is entered into between **NASH FINCH COMPANY** ("Nash Finch") and **NOLLER'S, INC. ("Retailer")**.

**RECITALS:**

Retailer owns and operates a retail grocery facility in Lena, Illinois; and

Retailer has requested Nash Finch sell wholesale groceries and supplies to the store on open account, and provide a semi-annual rebate of one percent (1%) on purchases made (the **"Purchase Rebate"**); and

Nash Finch is willing to (i) sell wholesale groceries and supplies to Retailer on open account, (ii) make the 1% Purchase Rebate, and (iii) commit to other undertakings for Retailer in exchange for, among other things, its commitment to purchase from Nash Finch, on a continual basis, minimum amounts of groceries and supplies (together, the **"Product"**); and

In part consideration of Nash Finch's undertakings for Retailer, it is willing to purchase Product from Nash Finch;.

**THEREFORE, IT IS AGREED:**

## I. THE STORE

1.     **The Store**. The store subject to this Agreement is located at 201 Dodds Drive, Lena, Illinois 61048 (the "Store").

## II. TERMINATION OF EXISTING AGREEMENT

2.     **Existing Agreement Terminated**. Except as provided by this Section, upon the Effective Date of this Agreement, the Retail Sales & Service Agreement (the "Old Retail Agreement") entered into between the parties with an Effective Date of April 12, 1999 is terminated, and of no further force or effect.

Notwithstanding the foregoing, the final credit payment on a forgivable Promissory Note to be made pursuant to Section 5 (Page 3) of the Old Retail Agreement will be made pursuant to the formula provided in that Section 5.

The final, maximum Promissory Note credit ("Maximum Note Credit") under the Old Retail Agreement is Three Thousand Two Hundred Dollars ($3,200), and it (or any lower amount,

3/16/04

reduced pursuant to the Section 5 formula) will be deducted from the Purchase Rebate, until the entire Maximum Note Credit has been offset.

## III. WHOLESALE PURCHASES

3.   **Wholesale Purchases**.

A.   **The Teamwork Percentage**: Retailer agrees to purchase from Nash Finch Product for the Store in an amount not less than fifty percent (50%) of the semi-annual retail sales volume of the Store, calculated by taking the price paid by Retailer for Purchases (defined in Section 4) from Nash Finch for the Store and dividing it by the gross retail sales of the Store, excluding liquor, beer, wine and gasoline.   ⟍ Lotto

The 50% teamwork percentage purchase requirement is hereinafter referred to as the "50% Minimum."

B.   **All Stores Included**: Purchases of Product shall be required of the Store, together with any additional or replacement stores (pursuant to Section 6 of Article IV) which shall also purchase Product.

C.   **A Semi-annual Requirement**: The 50% Minimum must be achieved on a semi-annual basis.

D.   **Continual Business Required**: In addition, on a weekly basis, Nash Finch is to be the primary supplier to the Store in the following categories of goods:

- Grocery
- Frozen
- Health & Beauty Care
- General Merchandise

- Produce
- Meat
- Dairy
- Bakery

- Supplies
- Deli
- Cigarettes
- Central Bill

4.   **Calculating Purchases**.

A.   **What Is Included**: The amount of Purchases made from Nash Finch by Retailer shall include:

(i)   The vendor invoiced gross amount for central bill purchases; and

(ii)   The vendor invoiced gross amount for cross-docking purchases; and

(iii)   Other invoiced amounts; but

as to all the foregoing Purchases, only amounts paid to Nash Finch by Retailer shall be included in the calculation.

3/16/04

B.    What Is Excluded: Distribution fees, freight charges, charges for services and equipment, miscellaneous fees and charges shall not be included when calculating the amount of Purchases made by Retailer from Nash Finch.

The purchases of Retailer so calculated shall hereinafter be referred as the **"Purchases."**

5.    **Pricing**. The following fees and charges will apply to this Agreement:

A.    Product: Product is priced at a quoted selling price (current, on retail price sheets) before a distribution fee and freight, and Nash Finch retains the right to change the quoted selling price at any time.

B.    Distribution Fees: Distribution fees (not including freight) shall be paid by Retailer in accordance with the current Nash Finch fee schedule (which is on a floating week-to-week schedule), as it may be amended by Nash Finch from time to time.

C.    Freight: Unless arrangements are made (reasonably acceptable to Nash Finch) for Retailer to use its own sources for transportation and delivery, the Nash Finch freight charges initially will be those in effect on the Effective Date of this Agreement, including among other things, automatic fuel surcharges for fuel price increases.

D.    Miscellaneous Charges: The following are examples of miscellaneous charges which, if applicable, shall apply and be paid by Retailer, initially, at the rates in effect on the Effective Date of this Agreement:

- Weekly Administrative Fee
- NashNet
- Telxon Machine
- Fuel Surcharges
- Shelf Tags
- Case Labels
- Plastic Pallets
- Delivery Ticket Charge

The miscellaneous charges, freight charges and distribution fees are subject to change from time to time by Nash Finch as part of any distribution-center-wide, regional or nationwide change.

## IV. ADDITIONAL & REPLACEMENT STORES

6.    **Additional & Replacement Stores**. If Retailer, or an affiliate, (or any principal of either) (i) purchases additional grocery store(s), and/or (ii) constructs new store(s), and/or (iii) replaces the existing Store, any such store(s) shall be subject to this Agreement, provided it is (or they are) within Nash Finch's service area.

Any retail grocery facility added to this Agreement pursuant to this Section, shall become the "Store," as earlier defined. Any affiliate or principal referred to in the first paragraph of this Section shall be covered by this Agreement.

3

3/16/04

## V.    THE PURCHASE REBATE & PAYMENT
### SEMI-ANNUAL HANDLING

7.    **The Purchases Which Qualify.** The Purchases (as defined in Section 4) from Nash Finch which will qualify for a Purchase Rebate shall exclude (i) central billing of vendors (ii) cross-dock, (iii) cigarettes, and (iv) items excluded (like distribution fees) by virtue of how "Purchases" are defined.

These limited Purchases which qualify for the semi-annual Purchase Rebate will hereinafter be referred to as the "**Rebate Qualified Purchases.**"

8.    **The Rebate & its Trigger Date.** Beginning with the first shipment to Retailer following the Effective Date of this Agreement, and provided Retailer meets the 50% Minimum (and is otherwise in compliance with this Agreement), then Nash Finch will accrue and rebate to Retailer on a semi-annual basis (based upon Nash Finch's accounting quarters) a sum equal to one percent (1%) of its current semi-annual period's Rebate Qualified Purchases.

9.    **Possible Reductions to Purchase Rebate.** If Retailer fails to achieve the 50% Minimum for any particular semi-annual period, the Purchase Rebate shall be reduced according to the following formula:  for each full percentage by which the minimum Purchase requirements are below 50%, then there shall be a twenty percent (20%) drop in the Purchase Rebate for that particular semi-annual period.

The following shows the formula in its application:

| % of Purchases Made | Semi-annual Percentage Purchase Rebate | Comments |
|---|---|---|
| 50% or more | 1.0% | Full rebate given |
| 49% | 0.8% | Rebate reduced by 0.2% |
| 48% | 0.6% | Rebate reduced by 0.4% |
| 47% | 0.4% | Rebate reduced by 0.6% |
| 46% | 0.2% | Rebate reduced by 0.8% |
| 45% or less | 0.0% | No rebate given |

Partial fractions up to five-tenths of a percent (.5%) like 47.49%, shall be rounded down to the nearest whole number; and partial fractions at or above five-tenths of a percent (.5%) like 47.58% shall be rounded up to the nearest whole number.

## VI.    ADMINISTERING THE PURCHASE REBATE

10.    **Forgivable Note Credit Applies First.** The Purchase Rebate will be calculated based on Purchases beginning on the Effective Date of this Agreement; but, the Maximum Note Credit shall be first deducted from the Purchase Rebate until the Maximum Note Credit has been offset in full.

3/16/04

For example, if the first Purchase Rebate credit totals Four Thousand Dollars ($4,000) and Retailer qualifies for the Maximum Note Credit of Three Thousand Two Hundred Dollars ($3,200), then Retailer's first semi-annual Purchase Rebate will be the difference, a total of Eight Hundred Dollars ($800).

11.   **Timing of Payment**. The Purchase Rebate payment will be (i) calculated on Rebate Qualified Purchases made on a semi-annual basis (based upon Nash Finch's accounting quarters), and (ii) paid in the form of a credit to Retailer's open account, made within thirty (30) days following the close of each semi-annual period's Rebate Qualified Purchases and receipt by Nash Finch of the financial information required by this Agreement.

12.   **Maximum Rebate**. None. There shall be no maximum dollar amount applied to the Purchase Rebate.

13.   **Maximum Term**. The Purchase Rebate is available to be paid by credit through to April 12, 2012, but not thereafter even though the overall term of this Agreement may continue pursuant to Section 25.

14.   **Credit Only**. The Nash Finch Purchase Rebate will be only in the form of a credit against the open account of Retailer. No cash will be paid to Retailer, nor other form of credit given.

## VII. OPERATIONAL INTERFACE

15.   **Accounting Services or Financial Statements**. Retailer agrees either (i) to participate in Nash Finch's retail accounting services at the rates charged therefore from time to time, and to cooperate with Nash Finch's retail accounting personnel in furnishing all materials they may reasonably request in conjunction with such services; or (ii) to furnish for Nash Finch's review (a) certified sales reports quarterly and annually, and (b) financial statements indicating retail sales volume and operating results for the Store, in form and with content as reasonably required by Nash Finch, to Nash Finch within thirty (30) days of the close of each fiscal year of Retailer.

Retailer agrees to provide the quarterly and annual certified sales to Nash Finch, furnished in the format attached to this Agreement as Exhibit 1.

16.   **Inventories**. Retailer agrees to take semi-annual inventories of the Store, and provide to Nash Finch the results within thirty (30) days of the inventory dates.

17.   **Timely Deliveries**. Nash Finch shall make timely deliveries of quality Product with acceptable fresh code dating, undamaged and in clean and healthy condition.

18.   **Order and Delivery Schedules**. Nash Finch shall use its best efforts to offer delivery schedules based on Store hours necessary to Retailer's retail operation, and Retailer agrees to comply with Nash Finch's schedules.

3/16/04

19.   **Delivery and Unloading**. Nash Finch shall position its trucks for reasonable dock delivery, and Retailer agrees to (i) cooperate with Nash Finch to minimize the time required to make a delivery, and (ii) assist Nash Finch truck drivers in unloading Product.

20.   **Return of Merchandise**. If Product was shipped with an expiration date which would allow a reasonable time for sale pursuant to Nash Finch's freshness policies, Retailer shall not have the right to return it if the Product becomes outdated.

Perishable products (including meat) shall be checked by Retailer for freshness at the time of delivery, and notice to Nash Finch of unsalable Product must be made within twenty-four (24) hours of delivery.

21.   **Services & Programs**. Nash Finch will have the following services and programs available to Retailer, subject to applicable charges and the right of Nash Finch to make changes at any time as to their cost, nature and availability:

- Store Development and Engineering
- Advertising Assistance and Layouts
- Retail Sales and Service Assistance
- Total Merchandising Program
- Sales Award Contests
- Coupon Redemption Plan
- Library (films, slides, food industry information)
- Weekly Information Program
- Catalog with suggested retails
- Electronic Store Ordering Program
- Management and Personnel Training
- NashNet

## VIII.  INITIAL CREDIT TERMS

22.   **Payment**. Retailer agrees to pay Nash Finch all fees and charges for Product, equipment and services furnished according to the applicable schedules, terms and conditions.

23.   **Initial Credit Terms**. Initial credit terms shall be an automatic clearing house payment ("ACH") initiated by Nash Finch on the day of delivery, to clear the following business day.

24.   **Potential Revocation of Credit**. Credit can be revoked by Nash Finch in its sole discretion, following which credit terms will be immediately available funds (wire transfer or certified check) on or before delivery or picking, at Nash Finch's discretion.

3/16/04

## IX.  TERM & CONFIDENTIALITY

25.  **Initial Term**.

A.    <u>Initial Term</u>:  Subject to the one (1)-year automatic renewal provision of this Section, this Agreement shall remain in force for the longer of (i) through to April 12, 2012 (about eight years from the Effective Date of this Agreement), or (ii) as long as any debt (excluding open account within terms) is owed to Nash Finch by Retailer (the "Initial Term").

B.    <u>Automatic Extension</u>:  Unless either party gives notice to terminate at least ninety (90) days prior to the expiration of (i) Initial Term, or (ii) any one (1)-year extension, this Agreement will automatically renew for successive periods of one (1) year.

The 90-day notice given by either party prior to the expiration of this Agreement (or subsequent one-year extension of it) shall terminate the automatic extension, and this Agreement will expire on its normal upcoming expiration date.

26.   **Confidentiality**.  Retailer shall keep confidential all fees, charges, buy plans, prices, discounts, rebates and allowances for Product, services, equipment or other.

Retailer also agrees (i) to only disclose the terms of this Agreement and the Purchase Rebate (the "Incentive Package") to those principals and professional advisors who need to know about it (or as required by law), and (ii) to otherwise keep the existence of the Incentive Package in the strictest confidence, and (iii) to require from such principals and professional advisors to whom the Incentive Package is disclosed, a binding promise from each to keep its existence strictly confidential.

Professional advisors is defined to include, but not limited to, banking professionals, accountants and lawyers.

## X.  CERTAIN BREACHES

27.   **Breaches by Retailer**.  A breach of this Agreement by Retailer by its failure (i) to use Nash Finch as its principal wholesale supplier, or (ii) to otherwise comply with the terms of this Agreement, gives Nash Finch the continuing option to declare a default under this Agreement.

Upon the declaration of such a default in writing by Nash Finch, (i) Nash Finch shall be entitled to damages for its lost profits, and (ii) Nash Finch can revoke credit terms and demand payment of Retailer's open account; and (iii) Nash Finch shall have no further Purchase Rebate obligations, either future or accrued; and (iv) Nash Finch can exercise any other rights pursuant to Section 28 (Cumulative Rights) herein dealing with general remedies.

28.   **Cumulative Rights**.  Except as limited by the Sections on Limitation of Liability and Force Majeure, the rights, options, elections and remedies contained in this Agreement shall be

3/16/04

cumulative; and none of such rights, options, elections and remedies shall be construed as excluding any of them or any right or remedy allowed or provided by law.

## XI. STORE SALES & CLOSINGS

29.  **Handling a Store Closing**. In the event the Store is closed (and no replacement store opened), then the following debts shall become immediately due and payable upon demand of Nash Finch:

   A.   The open account balance of the Store; and

   B.   Any other debt owed by Retailer to Nash Finch.

30.  **Handling a Store Sale**. A sale of the Store shall not terminate or otherwise affect any obligation of Retailer under this Agreement, including its obligation to make Purchases of Product from Nash Finch.

In addition, in the event the Store is sold, then the following debts shall become immediately due and payable:

   A.   The open account balance of the Store; and

   B.   Any other debt owed by Retailer to Nash Finch.

## XII. GENERAL

31.  **Notice**. Any notice which is necessary or permissible to be given under the terms of this Agreement shall be given in writing and shall be deemed to have been given or served on the date of mailing (i) by certified mail-return receipt requested, or (ii) via a nationally recognized overnight courier service; and in either manner, with postage prepaid, properly addressed as follows:

   If to Nash Finch:            Nash Finch Company
                                Attn:  Credit & Loan Department
                                7600 France Avenue South
                                Edina, MN  55435

   with copy to:                Nash Finch Company
                                Attn:  Legal Department
                                7600 France Avenue South
                                Edina, MN  55435

3/16/04

If to Retailer:

Personal & Confidential
Attn: Jim and Neil Noller
Box 457
201 Dodds Drive
Lena, IL 61048-0457

Either party may change the address or addresses to which notice is to be given to it by giving written notice to the other party not less than thirty (30) days prior to the effective date of the address change.

32.  **Modification**. Any amendment or modification to this Agreement must be in writing and signed by all parties; and any purported amendment or modification not both in writing and signed shall be void.

33.  **Complete Agreement**. This Agreement contains the entire understanding of the parties as it pertains to its contents, and all prior negotiations, representations, understandings or agreements, whether written or oral, shall be deemed both merged into this Agreement and of no further force or effect to the extent to which they may conflict with the terms of this Agreement or expand upon them.

34.  **Limitation of Liability**. Notwithstanding Nash Finch's efforts to provide quality items, services and programs to Retailer, Nash Finch's liability with respect to any items, services and programs shall be limited to replacement of any defective items, service or program, or a refund of the purchase price, at Nash Finch's option. Retailer releases Nash Finch from, and Nash Finch shall not be liable for, any special, consequential or punitive damages, regardless of the facts or theory upon which the claim is based.

35.  **Non-Waiver**. Nothing in this Agreement shall be considered waived by either party unless given in writing; and no such written waiver shall be a waiver of any past or future (i) default, or (ii) breach; nor shall it be or considered a modification (nor anything else) of any of the terms, provisions or conditions of this Agreement, unless expressly stipulated in the waiver.

36.  **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

37.  **Cross Default**. A default under this Agreement by Retailer shall also constitute a default under any or all of the following: (i) any debt owed to Nash Finch, or (ii) any other agreement in which Nash Finch owes an obligation or has given a right to Retailer.

A default under this Agreement grants Nash Finch the continuing option to terminate any or all agreements (or exercise any other remedy), without damages, penalties or other costs to Nash Finch.

3/16/04

38.  **Use of Legal Counsel**. The parties to this Agreement have either consulted with their legal counsel concerning the terms and conditions of this Agreement, or have, at their own option, knowingly and freely elected to not seek legal counsel in entering into this binding legal contract.

39.  **Waiver of Jury Trial**. The parties waive any right they may have to trial by jury in respect to any litigation based hereon, or arising out of, under, or in connection with, this Agreement and any agreements contemplated hereby to be executed in conjunction herewith, or any course of conduct, course of dealing, course of performance, statements or representations (whether verbal or written) or actions of the parties. This provision is a material inducement for the parties entering into this Agreement.

40.  **Severability**. If any term, covenant, condition or provision of this Agreement, or the application thereof to any circumstance, shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions, and provisions of this Agreement shall not be affected and each remaining term, covenant, condition and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only as broad as is enforceable.

41.  **Force Majeure**. Except for payment by Retailer of fees and charges, each party shall be excused from its respective obligations under this Agreement in the event and to the extent that its performance is delayed or prevented by fire, explosion, breakdown in machinery or equipment, strikes or other labor disputes, riots or other civil disturbances, compliance with any applicable law, order, regulation or applicable federal, state or municipal governmental authority or person purporting to act thereunder, or by any other circumstances reasonably beyond the control of the parties.

42.  **Recitals Incorporated**. The recitals to this Agreement are incorporated into and constitute an integral part of this Agreement.

43.  **No Venture or Partnership**. The relationship between the parties in this Agreement shall, at all times, be that of a wholesale supplier and retail customer. Nothing contained in this Agreement shall be construed as establishing Retailer as (i) an agent, or (ii) a partner, (iii) a franchisee, or (iv) a joint venturer with Nash Finch.

44.  **No Third-Party Beneficiary**. This Agreement is for the benefit of the parties only and not for that of any purported or claimed third-party beneficiary.

45.  **No Representations**. There are no representations, warranties, covenants, or promises, express or implied, other than those specifically referred to in this Agreement.

46.  **Multiple Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original for all purposes and all of which shall constitute but one and the same instrument.

3/16/04

47.   **No Assignment**.  This Agreement cannot be assigned by Retailer, in whole or in part, without the prior written consent of Nash Finch which it may withhold in its sole and absolute discretion.

48.   **Effective Date**.  The actual date or dates of execution by the parties is or are, respectively, the date or dates set forth underneath the signatures, and this Agreement shall be considered entered into on the latest of such dates (the **"Effective Date"**).

[SIGNATURE PAGE FOLLOWS]

3/16/04

[SIGNATURE PAGE FOR RETAIL SALES AND SERVICE AGREEMENT]

**NOLLER'S, INC.**

Signature: _Neil Noller (signature)_

Name: _Neil Noller_

Title: _MGR_

Date: _4/30/04_

Signature: _Jim Noller (signature)_

Name: _Jim Noller_

Title: _Owner_

Date: _4/30/04_

**NASH FINCH COMPANY**

Signature: _LeAnne M. Stewart (signature)_

Name: _LeAnne Stewart_

Title: _Vice President & Corporate Controller_

Date: _6/9/04_

3/16/04

## EXHIBIT 1

### Certified Statement of Quarterly or Annual Gross Sales

A.    Store Owner:    _____

B.    For Time Period:    _____

C.    Store Name, Location and Sales:    _____

_____

_____

### Certification

The undersigned hereby certifies to Nash Finch Company that the total, quarterly or annual (as applicable) retail sales volume stated above is accurate, based upon and consistent with prepared tax returns, or those to be prepared.

Signature: _____

Name: _____

Title: _____

Date: _____

3/16/04